IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Leroy H. Wilks, Jr. | ) | C.A. No. 3:08-00225-CMC |
| | ) | |
| Plaintiff, | ) | **OPINION AND ORDER** |
| | ) | **GRANTING MOTION FOR** |
| v. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| United States of America and University of | ) | |
| South Carolina School of Medicine,[1] | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————————— | ) | |

This action for medical malpractice is before the court on motion to dismiss or in the alternative for summary judgment filed by Defendant University of South Carolina School of Medicine ("University"). The University's motion rests on multiple grounds including, most critically, that (1) the claims pled in the complaint are time-barred to the extent asserted against the University because the alleged negligent actions occurred and Plaintiff had notice of them on or before January 23, 2006, and (2) discovery has failed to produce evidence sufficient to hold the University liable for any negligent treatment which Plaintiff may have received.

Because the court has considered matters beyond the pleadings, the motion is resolved under the summary judgment standard. For the reasons set forth below, the motion is granted in full.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that

---

[1] This caption reflects the earlier substitution of the United States for Defendant Fred W. Ortmann, IV, M.D. (Dkt. Nos. 25 & 26), and voluntary dismissal without prejudice of Defendant Palmetto Health Richland. Dkt. No. 57.

summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

The nonmoving party also cannot create a genuine issue of material fact by presenting his or her own conflicting versions of events. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). This rule applies equally to the testimony of non-party witnesses presented by the nonmoving party. *See Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 974-77 (4th Cir. 1990) (affirming trial court's rejection of expert's affidavit testimony which contradicted his sworn deposition testimony).

**BACKGROUND**

Through this action Plaintiff, Leroy H. Wilks, Jr., ("Wilks") seeks recovery from the United States of America ("Government") and the University of South Carolina School of Medicine ("University") for alleged medical malpractice. The alleged malpractice commenced in November 2004 when Wilks was a patient at the Dorn Veterans Administration Medical Center ("Dorn VA"). Although this order addresses only the claims against the University, those claims may only be understood in the context of the allegations against both the Government and the University.

**Administrative Claim**. The allegations against the Government were first set forth in an administrative claim ("Claim") filed on November 12, 2006. *See* Dkt. No. 86-3. The Claim is referred to in the complaint as being "attached and incorporated by reference." Dkt. No. 1 ¶ 2 (Complaint). The Claim is not, however, attached to the complaint. It was not, in fact, filed until recently in relation to the Government's motion to dismiss (in part) for lack of subject matter jurisdiction or, in the alternative, to exclude certain evidence. *See* Dkt. No. 86-3 (attachment to Government's motion); Dkt. No. 95-2 (attachment to Wilks' opposition).[2] Nonetheless, the court begins its recitation of the facts by summarizing Wilks' allegations as set forth in the Claim.

In the Claim, Wilks asserts that the agents or employees of the Government (collectively referred to as "Government") failed to properly supervise him, causing him to suffer a fall which

---

[2] The Government's motion focused on differences between the malpractice allegations found in the Claim and arguably more expansive allegations raised by Wilks' second (and more recently named) expert witness. The court denied the motion to dismiss without prejudice noting, *inter alia*, that the Claim included a non-time-specific allegation that the Government's agents failed to follow through on a plan "to surgically correct the improperly healed hip fracture problems . . . because the claimant's enzyme levels [were] too low to risk surgery." *See* Dkt. No. 112 (noting that no time was specified for this alleged negligence other than that this failure necessarily predated the filing of the claim on November 17, 2006).

resulted in two broken hips.[3]  Wilks further alleges that the Government failed to adequately treat

his resulting injuries, including by delaying any orthopaedic examination for several days following

his fall.  Dkt. No. 95-2 at 4-5 (Claim Narrative).   Nonetheless, Wilks notes in his Claim that the

Government took the position that the fractures were old fractures "which had not healed properly."

*Id.* at 5.   Despite focusing on deficiencies predating his December 20, 2004 discharge, the Claim

includes more general (non-time-specific) allegations that: "[t]he doctors initially planned to

surgically correct the improperly healed hip fracture problems but the orthopedic surgeons have

declined to operate because the claimant's enzyme levels are too low to risk surgery."  Dkt. No. 95-2

at 5 (asserting that Wilks remained in the nursing care unit at the time the Claim was filed – two

years after the November-December 2004 hospitalization detailed in the Claim).   The Government

denied Wilks' Claim on July 23, 2007.  Complaint ¶ 2.

> **Complaint.**  Wilks filed this action on January 23, 2008, providing the following summary

of his claims under his jurisdictional allegations:

> This action is brought within all applicable limitations periods because Defendant
> Dorn VA employees initially informed Plaintiff and his family that his inability to
> walk was psychological; and, after discovering that he had sustained bilateral hip
> fractures, Defendants repeatedly informed and insisted to Plaintiff's family that the
> fractures were old, chronic, non-acute, non-union fractures which Plaintiff sustained
> prior to his admission to the Dorn VA.

Complaint ¶ 4.

---

[3]  This failure to supervise and provide treatment for "acute" fractures appears to be the focus
of the Claim as evidenced by the following statement: "The family and the claimant insist that he
had never sustained hip fractures prior to entering the VA medical center and has always been able
to walk and live independently.  An orthopaedist brought in by the VA to evaluate him told the
family during the treatment team meeting at the VA hospital that it would have been impossible for
him to have walked into the hospital [as he allegedly did with the aid of a cane] with the fractures."
Dkt. No. 95-2 at 5.

Wilks named not only the Government, but three other Defendants in his Complaint. One of those Defendants, Fred W. Ortmann, IV, M.D., was identified as "a resident/physician/employee with Palmetto Health Richland/University of South Carolina, Orthopaedic Surgery Department." Complaint ¶ 11. An earlier paragraph alleges that "Dorn VA also contracts with certain health care providers and Plaintiff is informed and believes that Defendant Dorn VA may have been under contract with Defendant Palmetto Health Richland/University of South Carolina, Orthopaedic Surgery Department at the times relevant to this action." Complaint ¶ 10. The University is not mentioned again in the Complaint. Thus, these are the only allegations which indicate why the University was named as a Defendant. *See also* Complaint at Caption (naming "Palmetto Health Richland/University of South Carolina School of Medicine").[4]

Under the heading "Factual Background Applicable to Each Cause of Action," Wilks provides a detailed outline of his hospitalization at Dorn VA from November 19, 2004 through December 20, 2004. Complaint ¶¶ 13-33. Dr. Ortmann is specifically referenced in only one paragraph in this section which reads as follows:

> Ten days after Dorn VA employees found Plaintiff lying in the floor in a puddle of water complaining of pain in his hips and inability to walk, Defendant John Ortmann, IV., M.D., conducted an orthopaedic consultation around 4:55 p.m. Dr. Ortmann allegedly examined Plaintiff with Dr. Blincow that afternoon. The radiographs confirmed for the first time that Plaintiff had sustained "bilateral femoral neck fractures with callus formation present." The doctors recommended nutrition assessment due to poor albumin and pre-albumin levels.

---

[4] Both in the caption and paragraph 11, Wilks uses a slash between the names of the two entities, suggesting an "and/or" relationship. In the context of paragraph 11, the nature of the relationship would appear to be dependent on whether Dr. Ortmann was an employee or agent of one or both entities.

Complaint ¶ 29.[5]  The only physicians mentioned by name other than Dr. Ortmann are Dr. Blincow (referenced in the above paragraph) and Dr. Henry T. Yu, who is identified as the physician who, on November 29, 2004, concluded that Wilks' pain was not from degenerative joint disease. Complaint ¶ 27.

This chronological summary proceeds through Wilks' December 20, 2004 discharge, and December 22, 2004 return.  It then notes that he "was eventually admitted to the Nursing Home Care Unit where he remained until his discharge around June of 2007."  Complaint ¶ 32.  The last paragraph of the chronological summary reads as follows:

> As a result of the injuries sustained by Plaintiff while in the care of the Dorn V.A. Medical Center, and/or the failure of the Dorn V.A. medical staff to timely evaluate and treat his injuries, Plaintiff remained in the VA hospital's nursing care unit for almost 3 years until his discharge in or about June 2007.

Complaint ¶ 33.  No details are provided as to any treatments, consultations, or other occurrences between December 22, 2004 and the filing of the Complaint.[6]

These allegations are followed by a section titled "Causes of Action" which sets forth a claim for professional negligence collectively against Defendants.  Neither the University nor any physician is specifically named in this section, although there are several (always singular) references to the "Defendant orthopaedist," which presumably refers to Dr. Ortmann.  This section contains a multi-part paragraph referring to the "acts and/or omissions" of the "Defendant health care providers" which "fell below the accepted standards of medical care, skill and treatment then

---

[5]  The court presumes the identification of Dr. Ortmann here as "John" rather than "Fred" is a scrivener's error.

[6]  There is one reference to events occurring in November 2007.  The context of this statement, however, confirms that the year given is a typographical error and the correct year should be 2004.  Complaint ¶ 26.

and there prevailing." As with the chronological summary, these allegations focus on an alleged "fail[ure] to perform appropriate physical examinations or diagnostic tests . . . for ten (10) days following Plaintiff's continuous complaints of intense pain . . . after being found lying . . . in a puddle of water," including a failure to have him examined by "an orthopaedic specialist until November 30, 2004." Complaint ¶ 36(b). The next subparagraph refers specifically to failures by "Dorn V.A. to recognize symptoms, provide appropriate and timely examination, evaluation, care and treatment[.]" Complaint ¶ 36(c).

The last two subparagraphs are the only ones to refer to actions specifically by an "orthopaedist" and read as follows:

> (d)    further, Defendant orthopaedist failed to adequately review Plaintiff's X-rays, failed to diagnose Plaintiff's condition as acute and failed to administer such treatment as could have and should have been administered in the exercise of the degree of care, skill, diligence, and knowledge ordinarily exercised and possessed by orthopaedic physicians and surgeons practicing in the area or similar localities.

> (e)    Defendant orthopaedist failed to advise Plaintiff of the risk of failing to surgically treat his condition.

Complaint ¶¶ 36 (d)-(e).

The next two paragraphs appear to differentiate between the wrongs alleged against Dorn VA and those alleged against Dr. Ortmann (and, presumably, his employer(s)), while a third alleges causation:

> 37.   In treating Plaintiff , *Dorn VA* medical staff as described above, departed from the standard of care and practice of this and similar communities by disregarding and ignoring Plaintiff's complaints of intense pain in his lower extremities, in failing to timely diagnose Plaintiff's condition, failing to timely take X-rays of Plaintiff's lower extremities, failing to timely recommend an orthopaedic specialist and prematurely discharging Plaintiff.

> 38.   *Defendant orthopaedist* failed to exercise reasonable and ordinary care, skill and abilities in reviewing Plaintiffs recent medical history and test results and properly treating Plaintiff's bilateral hip fractures.

39. Th[e] Defendants' failure to exercise reasonable and ordinary care, skill and ability in recognizing, evaluating, diagnosing and/or treating Plaintiff's bilateral hip fractures was the direct and proximate cause of Plaintiff's injuries.

Complaint ¶¶ 37-39. The remaining paragraphs address resulting damages.

**Attached Opinion of Dr. Daniels.** There is only one attachment to the complaint.[7] That consists of an undated letter-opinion from William C. Daniels, M.D. ("Dr. Daniels") who offers his "opinion, to a reasonable degree of medical certainty, that the Dorn VAMC and it's [sic] employees fell below the generally accepted standards of care in the medical evaluation and treatment of Mr. Wilks." Dkt. No. 1-1 at 1. He gives, as an example, the "failure to obtain proper radiographic studies" after Wilks' "fall on Nov. 20, 2004[.]" Dr. Daniels also opines "that the orthopedic consultant, Fred Ortman[n], IV, M.D. was below the standard of care in his medical evaluation and treatment of Mr. Wilks. An example of this was his failure to diagnose the hip fractures as <u>acute</u> and to perform proper surgical repair." *Id.*

Dr. Daniels' remaining opinions relate to causation and resulting damages. He states that he reached this opinion after reviewing Dorn VA medical records, X-rays taken on nine dates between November 29, 2004 and June 5, 2006, and an MRI conducted on May 9, 2005. *Id.*

**Subsequent Expert Witness Reports.** On February 10, 2009,Wilks filed his first expert witness disclosure report in which he identified both Dr. Daniels and Harold Delano Schutte, Jr., M.D., an Orthopaedic Surgeon, as expert witnesses. Dkt. No. 50 (also identifying two nurses as experts). This report states that Wilks had previously provided Dr. Daniels' report which the court presumes to be the report set forth above. However, despite having received two, sixty-day

---

[7] As noted above, the pre-suit Claim filed with the Government is referred to in the Complaint as an attachment but is not, in fact, attached.

extensions of his expert witness deadline and serving this report five days after that deadline, Wilks stated in this report that Dr. Schutte "ha[d] not yet completed his written report but is currently reviewing Plaintiff's medical records and images made from his admission to the VA Medical Center through December, 2004, and all orthopaedic consultations." Dkt. No. 50.[8]

On May 8, 2009, three months after filing the above report and two days after the close of discovery, Wilks filed a supplemental expert report which provided some of the additional information required by Rule 26(A)(2) (*e.g.,* rates charged) and indicated that Dr. Schutte's expert report was attached.[9] Dkt. No. 63. Although not attached to the document filed with the court (as it is not required to be), the court presumes that the report was provided to Defendants at the time this document was filed and that it consists of Dr. Schutte's letter report which was filed by Wilks in response to the University's motion.

This report, dated April 24, 2009, is self-described as a "preliminary report." Without making any distinction between the Defendants or doctors, this report offers the following opinions:

> 5.  It is my professional and expert opinion, within a reasonable degree of medical certainty, that, at the least, a removal of the femoral heads, a girdlestone type procedure, should have been done. More optimally a femoral head replacement or hemiarthroplasty. Even with a risk of infection it would have at least given [Wilks] a chance to become ambulatory and significantly

---

[8] Pursuant to the third amended scheduling order, Wilks was required to file a document identifying his experts and certifying "that a written report prepared and signed by the expert pursuant to Fed. R. Civ. P. 26(a)(2)(B) has been disclosed to other parties by **February 5, 2009**." Dkt. No. 48 (entered December 10, 2008). This scheduling order also set a May 6, 2009, deadline for completion of discovery.

[9] In his earlier disclosures, Wilks purported to "reserve the right" to file a supplement (and a belated report for Dr. Schutte). Such a reservation of rights ignores the clear intent of the scheduling order and will not normally be honored by the court. Defendants did not, however, object to Wilks' much-belated supplementation. Thus, for purposes of this order, the court treats Dr. Schutte's later-served report as timely.

decrease his pain. This is not considered an elective procedure.

6.       It is also my professional and expert opinion, within a reasonable degree of medical certainty, that the orthopaedic evaluation and treatment rendered to Mr. Wilks while he was a patient at the Dorn V.A. Medical Center fell below the generally accepted standards of medical care by the failure to perform surgical repair or excision of his bilateral femoral neck fractures.

7.       It is my further professional and expert opinion, to a reasonable degree of medical certainty, that, more likely than not, Mr. Wilks would have significantly less pain and possibly be ambulatory if he had received the appropriate surgical repair of his bilateral femoral neck fractures.

Dkt. No. 106-6. No other evidence of Dr. Schutte's anticipated opinions is provided, although the court granted additional time for supplemental discovery after this report was filed.[10]

**Additional Evidence filed in Opposition to Summary Judgment Motion.** Wilks filed various medical records in his opposition memorandum which suggest that two University physicians, John L. Eady, M.D. ("Dr. Eady") and David Koon, M.D. ("Dr. Koon"), had some involvement with his care between January 2005 and August 2006, thus bridging the critical statute of limitations date for purposes of claims against the University: January 23, 2006.[11] Part of this

---

[10] The court held a status conference on May 18, 2009, to address a motion for discovery filed by Wilks on May 14, 2009. Dkt. No. 71. As a result of that conference, the court granted a request to relieve Wilks' original attorney as counsel given the likelihood she would be called as a witness. Dkt. No. 71. The court also granted the parties' joint request to extend discovery through July 20, 2009, for limited purposes including depositions of various experts. Dkt. No. 73. The court denied the parties' request to add nutritional experts, but allowed currently named experts to amend their reports no later than June 1, 2009, to address nutritional issues. The court is not aware of whether any such supplemental reports were filed.

[11] These records suggest that Dr. Koon was the first University employee to have any involvement with Wilks' treatment. That involvement apparently commenced with Dr. Koon's or other University physician's participation in a conference with other physicians in January 2005. Dkt. No. 106-3 at 9 (January 14, 2005, notation by Barnaby T. Dedmond (apparently a physician at Dorn VA) stating " Mr. Wilks' case was discussed with entire faculty of University Orthopedics this morning."). It does not appear that Dr. Koon assumed any responsibility for Wilks' care at this time or even examined him. A note by Dr. Eady indicates that he first evaluated Wilks during

care included Dr. Koon's scheduling of surgery in early January 2006 (the notes suggest either the sixth or eleventh). That surgery was cancelled for reasons that are not entirely clear. In his deposition, Dr. Koon expressed his "vague recollection" that the surgery was scheduled for January 6, 2006, and that the cancellation "was a mutual decision between myself and the family." Koon depos. at 48. Dr. Koon did not recall the specifics of the discussion but stated that he still believed surgery was necessary at that time. *Id.*

In an August 2009 affidavit offered in opposition to summary judgment, Joyce Cheeks, Wilks' attorney-in-fact, confirms that Koon discussed the cancellation with her and mentions that the basis for the cancellation was Wilks' "low enzyme levels." She does not address whether the decision was mutual as suggested by Dr. Koon. Neither does she suggest any malfeasance by Dr. Koon in cancelling the surgery. Instead, she turns her attention to the original focus of the complaint: allegations that Wilks' fractures were the result of a fall while he was in Dorn VA:

> 11. This pattern [of scheduling and cancelling surgeries] continued into January of 2006, when surgery was again scheduled and then cancelled right before the scheduled date because of low enzyme levels. During that meeting with the orthopaedist, Dr. Koon,. . . , to discuss the cancellation, I informed him that [Wilks] walked around the hospital's campus and had walked up to the psychiatric ward on the date of admission. I then inquired whether, in his opinion, [Wilks] could have done this with the kind of fractures he had sustained. Dr. Koon responded that, in his opinion, Leroy could not have walked in with the fractures.

> 12. Based upon Dr. Koon's response, I requested copies of [Wilks'] medical records. I received . . . over a thousand pages of medical records. Upon reading the records, I learned for the first time that the afternoon following his admission, the psychiatric staff had found [Wilks] . . . lying in a puddle of water, complaining that he could not walk. No one had ever informed his mother or me of that incident.

---

March 2005, and that he recommended a total hip arthroplasty after some "aggressive nutritional supplementation." Dkt. No. 106-3 at 1-2. The next record of note is dated in November 2005 and indicates that Dr. Koon had reviewed Wilks' nutritional status and was "willing to undertake his case" through surgery in January 2006, as long as Wilks understood the risks associated with his nutritional condition. Dkt No. 106-3 at 3. The last medical record Wilks attaches is Dr. Eady's August 2006 note indicating that, by that point, Mr. Wilks was no longer a candidate for surgery. Dkt. No. 106-3 at 8.

Dkt No. 106-5 at 3(Cheeks August 2009 Affidavit).

Wilks also attached a number of other medical records from November 2004 when Wilks allegedly fell while staying at Dorn VA  Dkt. No. 106-2 at 1-10.  A final medical record, dated March 22, 2005, indicates that Frank Richard Voss, M.D. ("Dr. Voss"), evaluated Wilks on or about that date and recommended a "total hip arthroplasty."  Dkt. No. 106-3 at 1-2.

## DISCUSSION

I.     **Wilks' Claims Against the University Are Barred by the Statute of Limitations.**

The claims against the University are pursued under the South Carolina Tort Claims Act ("Tort Claims Act") and are, therefore, subject to a two-year statute of limitations.  *See* S.C. Code §§ 15-78-100(a) ("Except as provided for in Section 15-3-40, an action for damages under this chapter may be instituted at any time within two years after the loss was or should have been discovered . . . .") & 15-78-110 ("Except as provided for in Section 15-3-40, any action brought pursuant to this chapter is forever barred unless an action is commenced within two years after the date the loss was or should have been discovered . . . .").[12]  A claim accrues under the Tort Claims Act when the "the loss was or should have been discovered."  S.C. Code Ann. § 15-78-110.  A loss should be discovered when the circumstances would put a person of common knowledge and experience on notice that some right of his has been invaded, or that some claim against another party might exist.  *Joubert v. South Carolina Dept. of Social Services*, 534 S.E.2d 1, 9 (S.C. App. 2000).

---

[12]  Section 15-3-40 provides an exception for persons subject to certain disabilities.  Wilks does not argue that this section applies.  Both Sections 15-78-100 and -110 allow a longer period following rejection of a claim filed with the applicable state entity.  Wilks does not assert that he filed any claim with a state entity.

The University maintains that this action should be dismissed because the only wrongful actions alleged in the Complaint predate January 23, 2006, two years prior to the filing of this action. Wilks does not contradict that assertion but argues that he may rely on a "continuous treatment" rule. He maintains that this rule would allow him to pursue claims for negligent actions or omissions predating January 23, 2006, because those actions or omissions are part of a single course of treatment which began in November 2004 and continued through June or August 2006. It was on or near the latter dates that Wilks or members of his family acting on his behalf were advised that surgery was no longer an option due to deterioration of Wilks' condition. *See* Dkt. No. 106-5 at 3 (Cheeks affidavit asserting that she and Wilks' mother were informed in June 2006 that Dorn VA no longer intended to attempt surgery); Dkt. No. 106-3 at 8 (Dr. Eady's August 2006 notes indicating his conclusion that surgery was no longer an option).

**Continuous Treatment Rule Not Available.** The first difficulty with Wilks' position is that South Carolina has not adopted the continuous treatment rule. *See Harrison v. Bevilacqua*, 580 S.E.2d 109 (S.C. 2003) (rejecting reliance on the continuous treatment rule with respect to statutes of repose). In an earlier case, the South Carolina Supreme Court stated that even if it were to adopt the continuous treatment rule, it would be inclined to limit the retroactive date to the date when the patient did or should have discovered the injury giving rise to the cause of action. *Anderson v. Short*, 476 S.E.2d 475) (S.C. 1996). Given that the discovery rule is expressly incorporated into the Tort Claims Act's two-year statute of limitations, the continuous treatment rule would not extend the limitations period applicable in this action. Wilks' claims against the University are, therefore, time barred to the extent they involve events pre-dating January 23, 2006, unless facts suggest the injury was not and should not have been discovered until after that date.

13

The court, therefore, looks to the complaint for two purposes. First, the court determines whether the Complaint alleges any acts of negligence on or after January 23, 2006. Second, the court considers whether the Complaint alleges facts suggesting that any act of negligence predating January 23, 2006, was not "discovered" until after that date.

**Absence of Alleged Malpractice On or After January 23, 2006.** The only specific allegations of professional negligence set forth in the Complaint predate January 23, 2006 by over one year. For example, Wilks alleges that personnel employed at or by Dorn VA allowed him to fall in November 2004, causing injury to his hips, and, thereafter, failed to properly treat that injury despite his continuing complaints of pain and inability to walk continuing through his discharge on December 20, 2004. Complaint ¶¶ 17-31. Wilks also alleges that these injuries and lack of proper treatment led to a prolonged nursing home stay from late December 2004 though June 2007. Complaint ¶¶ 32-33. This nursing home stay is the only reference to any event in or after January 2006 and there is no specific reference to any negligent action or omission between December 20, 2004 and June 2007. Thus, the nursing home allegation, on its face, gives notice only of injuries which allegedly resulted from the earlier inadequate treatment, rather than any independent allegation of negligence.

The question thus becomes whether there is some basis for concluding that some *pre*-January 2006 negligence (which is adequately pled) was not and should not have been discovered until on or after January 23, 2006. The only suggestion of any later discovery of possible malpractice by a University physician is found not in the Complaint but in Cheeks' recently filed affidavit. The relevant paragraph acknowledges that Wilks' representatives were put on notice at some unspecified time in January 2006 that surgery scheduled during that month had been cancelled due to Wilks'

"low enzyme levels." Cheeks Affid. ¶ 11. In his opposition memorandum, Wilks refers to the surgery cancellation date as January 6, 2006, citing Cheeks' affidavit. *See* Dkt. No. 106 at 4. Other evidence also supports the conclusion that this surgery was scheduled on January 6, 2006, and cancelled on or before that date, although there is also one reference to January 11, 2006. Either date would, however, precede January 23, 2006. Thus, even assuming that the Complaint's allegations of malpractice included allegations that the cancellation of this surgery or related events constituted negligence, there are no facts to suggest that Wilks was not placed on notice of such a claim when he and his representatives were advised of the cancellation of the surgery. *See Dean v. Ruscon Corp.,* 468 S.E.2d 645, 647 (S.C. 1996) (holding that a claim accrues under the discovery rule when the facts and circumstances of an injury would give a reasonable person of common knowledge and experience notice of a potential claim).

Wilks suggests that the critical "discovery" date was in June or August 2006, because this was when Wilks' learned from University physician Dr. Eady that his condition had deteriorated to the point that he was no longer a candidate for surgery. This information is, however, relevant only to notice of the extent of his damages and does not suggest belated notice of any claim which he might have for cancellation of the surgery scheduled in early January 2006 or for any other event which delayed his receipt of surgery following his November 2004 hospitalization at Dorn VA. *Id.* (stating that accrual of a cause of action does not require the injured party to comprehend the full extent of his damages). Neither has Wilks alleged or directed the court to evidence of any other acts or omissions occurring between January and July 2006 (or at any later time) which he maintains constitutes negligence on the part of a University physician.

The Cheeks affidavit also suggests that Wilks suffered a fall during his November 2004 stay

at Dorn VA which may have caused his hip fractures and that his representatives only learned of this fall from medical records requested after cancellation of the surgery scheduled for January 6, 2006. *See* Cheeks Affid. ¶¶ 11-12.[13]  While this belated discovery of information relating to Wilks' fall might support application of the discovery rule as to liability for that fall, there is no evidence that any University employee was involved in Wilks' care at the relevant time.  In short, the belated discovery of the fall does not suggest delayed discovery of any claim *which might be asserted against the University*.

The court, therefore, finds that even applying the discovery rule, Wilks' claims for any act or omission of University physicians Koon or Eady (or other unnamed University physician) are time barred to the extent the alleged negligent acts or omissions predate January 23, 2006.  This would include Dr. Koon's cancellation of surgery in early January 2006.  The Complaint contains no allegations relating to a later period (specifically, January 23, 2006, though June or August 2006) which would fairly put the University on notice of any claim for actions or omissions during any later period.  Thus, there is no basis to allow either belated amendment of the Complaint or relation

---

[13]  In this August 20, 2009 affidavit, Cheeks states that in "January of 2006," the "surgery was again scheduled and then cancelled right before the scheduled date because of low enzyme levels." *See* Cheeks Aff. ¶ 11 (not providing any specific date for the surgery). She then explains that she met with "orthopaedist, Dr. Koon, a physician with the University of South Carolina School of Medicine, to discuss the cancellation" and inquired as to whether he thought Wilks could have been walking at the time of his admission if he, in fact, had sustained the fractures prior to that time. Dr. Koon opined that Wilks would not have been able to walk.  Based on that opinion, Cheeks requested Wilks' medical records and learned, upon receipt of those records (no date is provided) that he had been found lying in a puddle soon after his November 2004 admission to Dorn VA.  The next date referenced is in June 2006, when Cheeks was advised that the orthopaedists no longer considered Wilks a candidate for surgery due to the amount of bone loss.

back of any amendment which might be allowed.[14]

**Absence of Any Allegation of Malpractice by University Physicians.** Another difficulty with Wilks' claims against the University is the absence of any allegations in the Complaint or attached statement of Dr. Daniels, Wilks' original expert, which would put the University on notice that Wilks is alleging malpractice by any physician who is, in fact, affiliated with the University. Wilks' only physician-specific references in the Complaint are to Drs. Ortmann, Blincow and Yu.

The Complaint alleges that Dr. Ortmann is or was a dual Government and University employee during the time he treated Wilks. Complaint ¶¶ 10-12. There is not, however, any evidence to support the assertion that he was an employee of or otherwise affiliated with the University.[15] There are no other allegations which suggest liability on the part of the University.[16]

Neither Dr. Koon nor Dr. Eady is mentioned in the Complaint. Neither are there any references to unnamed "University" physicians. Further, the Complaint refers specifically to errors in treatment by the "Defendant Orthopedist," suggesting only a concern with a singular individual: Dr. Ortmann. Complaint ¶¶ 36 (d)-(e) & 38. Thus, there is nothing in the Complaint to put the University on notice of any claim that one of its employees committed malpractice. At most, there

---

[14] It is now more than three years after the last date of any relevant treatment or consultation by a University physician, the last date being in June or August 2006 when Dr. Eady concluded that Wilks was no longer a candidate for surgery. Thus, any claim based on treatment provided (or which should have been provided) between January 23, 2006, and August 2006 would be time barred absent relation back.

[15] The University denies that Dr. Ortmann was affiliated with the University and states that this fact is not in dispute. *See, e.g.,* Dkt. No. 88-2 at 5 (stating that "there is no dispute between the parties that the doctors and staff who treated [Wilks] in November and December of 2004, including Dr. Ortmann, were not contractors of the [University.]"). Wilks does not challenge this assertion and, in fact, fails to mention Dr. Ortmann anywhere in his opposition memorandum. Dkt. No. 106.

[16] Whatever the role of Drs. Blincow and Yu, there are no allegations either that they committed malpractice or that they were, at the relevant time, affiliated with the University.

is notice that Wilks incorrectly assumed Dr. Ortmann to be affiliated with the University. This is not enough to provide the University fair notice of any claim of negligence by some other University physician.

**New Allegations.** In opposing the University's motion, Wilks refers to a consultation in March 2005 by Frank Voss, M.D. (no affiliation is given), an evaluation by Dr. Koon in November 2005 which led Dr. Koon to schedule surgery on January 6, 2006 (this surgery was ultimately cancelled), and a determination by Dr. Eady in August 2006 that Wilks was no longer a candidate for surgery. Dkt. No. 106 at 3-5. Plaintiff also asserts that his "medical case was presented to USC School of Medicine in January of 2005," and that the University, thereafter, assumed responsibility for his orthopaedic care, first recommending surgery in March 2005. Dkt. No. 106 at 8.[17] Based on these facts, Wilks argues that "[i]t is abundantly clear that [University] employees were involved in the care of the Plaintiff from January 2005 to the present time *and therefore the acts and omissions of these employees are actionable*." Dkt. No. 106 at 8-9 (emphasis added).

A University-affiliated physician's mere involvement in a patient's care at some point in time does not, however, put the University employer on notice that the care given is the subject of a claim of negligence. This is particularly true where, as here, the Complaint contains no allegations (1) naming any physician employed by the University, (2) specific to the care given by any University physician, or (3) relevant to the period during which University physicians provided care. Given these deficiencies, the court finds that the Complaint does not provide notice of the new allegations

---

[17] The allegation that a University physician first recommended surgery in March 2005 implies that Dr. Voss was a University physician. While this may be true, it is not clear from the consultation notes on which Wilks relies. *See* Dkt. No. 106-3 at 1-2. In any event, there is no allegation of or evidentiary support offered for any claim that Dr. Voss was negligent in his recommendation. To the contrary, Wilks appears to rely on Dr. Voss's recommendation.

suggested in Wilks' opposition memorandum.[18]

## II. Absence of Evidence of Negligence by Any University Physician.

A final difficulty with Wilks' claims against the University, even if the new allegations are considered, is that he has failed to proffer expert testimony sufficient to support a jury verdict that any University physician violated an applicable standard of care. *See Pederson v. Gould*, 341 S.E.2d 633, 634 (S.C. 1986) (noting that expert testimony is required in medical malpractice actions to establish the standard of care, failure to conform to that standard of care, and causation except when these matters might be determined based on common knowledge of laypersons). This is in part due to the narrow scope of the opinions offered by Wilks' initially named expert, Dr. Daniels, and in part due to the lack of specificity of the opinions offered by his more recently named expert, H. Del Schutte, Jr., M.D. ("Dr. Schutte").

In the letter-report which was attached to the Complaint, Dr. Daniels referred only to Dr. Ortmann's alleged negligence. He made no mention of Drs. Eady or Koon or any other University physician. When he was deposed, Dr. Daniels conceded that he was not opining that either Dr. Eady or Dr. Koon acted negligently. *See* Dkt. No. 88-4 (excerpts from Dr. Daniels' deposition). Indeed, his testimony suggested he found both acted properly to the extent he had considered their actions. *Id.* (dep. p. 194-96) (stating that "Dr. Eady probably came into the picture so late that I don't see where I would be holding him responsible for any substandard care" and that Dr. Koon's evaluation

_____

[18] Although Wilks argues that amendment should be allowed, he has not filed any motion to amend the Complaint. Even if such a motion was filed, the motion would be denied absent extraordinary circumstances given that the deadline for amendment of the pleadings expired on July 9, 2008. There are no extraordinary circumstances in this action which would favor allowing such belated amendment. This is particularly true given the many extensions previously granted including allowing Dr. Schutte to appear as an expert witness despite Wilks' failure to serve Dr. Shutte's expert report until *after* the close of discovery.

in March 2006 was "probably not below the standard of care").[19]

In response to the University's motion, including the University's reliance on the above testimony, Wilks offers only Dr. Schutte's April 24, 2009 "preliminary report." That report (quoted *supra* at 9-10) opines that it was a violation of the standard of care for the treating physicians not to perform "a removal of the femoral heads, a girdlestone type procedure . . . [or] [m]ore optimally a femoral head replacement or hemiarthroplasty." Dr. Schutte also opines, more generally, that "the orthopaedic evaluation and treatment rendered to Mr. Wilks while he was a patient at the Dorn V.A. Medical Center fell below the generally accepted standards of medical care by the failure to perform surgical repair or excision of his bilateral femoral neck fractures." Dkt. No. 106-6 at 2. No further expansion of Dr. Schutte's opinions (such as through deposition excerpt or affidavit) has been proffered.

Thus, the sole evidence of Dr. Schutte's opinion supports a general conclusion that the care given Wilks "while he was a patient at the Dorn V.A. Medical Center" (a period beginning in November 2004 and running through at least June or August 2006)[20] was deficient, specifically in regard to the failure to perform surgical repair, and more specifically the particular form of repair preferred by Dr. Schutte. Wilks does not, however, provide any prediction that Dr. Schutte will offer a more specific opinion addressing, for instance, when or by whom the repairs should have

---

[19] Dr. Daniels' testimony as to Dr. Koon's treatment of Wilks focuses on a visit or consultation in March 2006. It does not expressly address the propriety of the decision to cancel surgery in January 2006 but does include the following general statement regarding Dr. Koon's treatment of Wilks: "I think he was willing to operate on the patient and tried to get the patient repaired." *Id.* (dep. at 196). None of the excerpts from Dr. Daniels' deposition suggest any concern with the actions of Dr. Koon, Dr. Eady, or any other University physician.

[20] The court uses June or August 2006 as the probable end date because this is when Dr. Eady opined that Wilks was no longer a surgical candidate. No evidence has been suggested that this opinion was, itself, incorrect.

been performed. Neither does he proffer evidence that Schutte will offer any opinion that any specific decision to postpone surgery (or perform some alternative surgery) was improper under whatever circumstances were then presented to the physician. Given the involvement of multiple physicians over a significant period of time, and the University's responsibility only for some actions within that period, detail of this nature is arguably necessary to overcome a motion for summary judgment based on the asserted absence of sufficient evidence.[21]

Under these circumstances, the evidence proffered to date against the University appears to be insufficient to support all of the elements of a malpractice claim which require support by expert testimony. *See generally Pederson*, 341 S.E.2d at 634. This is particularly true when considered in light of Dr. Daniels' specific testimony that neither Dr. Eady nor Dr. Koon was negligent (at least as to the matters addressed in Dr. Daniel's deposition) and Wilks' failure to identify any specific errors of any other University physician.

Despite these serious concerns, the court finds it unnecessary, ultimately, to rely on the absence of evidence in resolving the University's motion for summary judgment. This is because summary judgment is clearly proper based on the statute of limitations and pleading concerns addressed above. The court, therefore, reaches no final decision on whether Wilks' failure to present more detailed expert testimony at this stage in the proceedings supports entry of summary judgment in favor of the University.

---

[21] For example, in claiming negligence by the University, Wilks identifies only one specific act which he maintains gives rise to liability: the January 2006 cancellation of surgery. An opinion that this particular decision violated the standard of care would, presumably, need to consider the patient's condition at the time, information provided to the patient (and his agents) regarding the relative risks and benefits of the surgery, the decision of the patient (or his agents) regarding whether to proceed; and any other factors influencing the decision (*e.g.,* Dorn VA approval if needed). There is no suggestion that Dr. Schutte holds or intends to offer so specific an opinion as to this or any other instance of alleged violation of the standard of care by a University physician.

## CONCLUSION

For the reasons set forth above, the court concludes that the University of South Carolina School of Medicine is entitled to summary judgment on the following grounds: (1) Wilks' claims against the University are time-barred to the extent they involve events predating January 23, 2006; (2) the complaint contains no specific allegations of negligence by agents or employees of the University during the limitations period (on or after January 23, 2006); (3) the University cannot be held liable for the actions or inactions of Dr. Ortmann because it is uncontradicted that he was not an agent or employee of the University; and (4) Wilks will not be allowed to amend his complaint to allege claims against the University for actions by University physicians post-dating January 23, 2006 as no such allegations are suggested by the complaint and the time for amendment is long-expired. The court notes but declines to rest its ruling on arguments that Wilks has failed to proffer evidence sufficient to support a claim for negligence by any University physician.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
September 22, 2009